## CONTINUATION OF APPLICATION FOR SEARCH WARRANT

I, Marcel Behnen, being duly sworn, depose and state that:

## Introduction

1.     I am a Task Force Officer with the United States Drug Enforcement Administration ("DEA"), United States Department of Justice, and have been so employed since March 2019.   I have been a police officer with the Kalamazoo Department of Public Safety for over 14 years, the last 6 of which I have been assigned as an investigator with the Kalamazoo Valley Enforcement Team ("KVET"), which is tasked with investigating narcotics trafficking.   I am currently assigned to the Grand Rapids District Office in the DEA's Detroit Field Division.

2.     During my time as a KVET Investigator, I have participated in investigations of unlawful drug trafficking and, among other things, have conducted or participated in surveillance, the execution of search warrants, debriefings of informants, reviews of taped conversations and drug records, and have participated in investigations that included the interception of wire and electronic communications.   Through my training, education, and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the methods of payment for such drugs, the laundering of narcotics proceeds, and the dialect, lingo, and coded language used by narcotics traffickers. In connection with my duties, I investigate criminal violations of the Federal and State controlled substance laws including, but not limited to, conspiracy and attempt to possess with intent to distribute and to distribute controlled substances, in violation

of 21 U.S.C. § 846; possession with intent to distribute and distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1); use of communication facilities to facilitate drug trafficking offenses, in violation of 21 U.S.C. § 843(b); conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h); and money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i), 18 U.S.C. § 1956(a)(1)(B)(i), and 18 U.S.C. § 1957.

3.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of the following electronic devices (hereinafter the "**Subject Devices**") and their contents, which are described below and in Attachment A:

   a.      **Subject Device 1** - White/silver iPhone 13 pro (model A2483), IMEI 353165807408418, in a clear case.

   b.      **Subject Device 2** – Black Samsung Galaxy Z Flip3 phone, IMEI 350579005509764, in a black case.

4.      The **Subject Devices** were seized from the kitchen dining area of 524 Florence Street, Kalamazoo, MI on November 10, 2022, and are currently in the custody of KVET in Kalamazoo, MI.

5.      The applied-for warrant would authorize the forensic examination of the **Subject Devices** for the purpose of identifying electronically stored data particularly described in Attachment B.

6.    There is probable cause to believe that Tyrone HENDERSON has:

    a.    Knowingly and intentionally possessed with intent to distribute controlled substances – specifically 400 grams or more of a mixture and substance containing a detectable amount of fentanyl, 100 grams or more of a mixture and substance containing a detectable amount of heroin, and 50 grams or more of a mixture and substance containing a detectable amount of methamphetamine – in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(vi), 841(b)(1)(B)(i), 841(b)(1)(B)(viii).

    b.    Knowingly and intentionally possessed firearms, after having been convicted of a felony offense, in violation of 18 U.S.C. § 922(g)(1).

    c.    Knowingly and intentionally possessed firearms in furtherance of the drug trafficking crime of possession with intent to distribute controlled substances, in violation of 18 U.S.C. § 924(c)(1)(A)(i),

7.    On November 14, 2022, the U.S. Attorney's Office charged Tyrone HENDERSON with these offenses by criminal complaint. *See* 1:22-mj-472. I submit that there is probable cause to believe that evidence of drug trafficking will be found on the **Subject Devices**.

8.    The facts in this continuation come from my personal observations, my training and experience, and information obtained from other law enforcement officers, agents, and witnesses. This continuation is intended to show merely that there is sufficient probable cause for the requested search of the **Subject Devices**

and does not set forth all my knowledge about this matter.

## Probable Cause

9.      HENDERSON is a 50-year-old male and a resident of Kalamazoo, Michigan. HENDERSON has the following felony criminal convictions:

    a.  May 1994 – Delivery/Manufacture (cocaine, heroin or another narcotic) less than 50 grams.

    b.  June 2002 – Importation of Heroin

    c.  April 2017 – Failure to Pay Child Support

    d.  April 2017 – Assault/Resisting/Obstructing Police.

10.     Since the Summer of 2021, the Kalamazoo Valley Enforcement Team (KVET) has been investigating HENDERSON and his involvement in the distribution of methamphetamine and heroin and fentanyl through anonymous tips, KVET Confidential Source (CS) information and surveillance. The investigation eventually stalled until September 2022 when new information was received and investigators were able to conduct the following controlled buys from HENDERSON utilizing a KVET CS at HENDERSON's residence on Florence St, in Kalamazoo, MI, which is where the **Subject Devices** were eventually seized:

    a.  Controlled Buy #1 - October 2022 – KVET CS successfully purchased a quantity of methamphetamine from HENDERSON.

    b.  Controlled Buy #2 - October 2022 – KVET CS successfully purchased a quantity of methamphetamine and fentanyl from HENDERSON.

    c.  Controlled Buy #3 - November 2022 - KVET CS successfully purchased

a quantity of methamphetamine and fentanyl from HENDERSON.

    d. Controlled Buy #4 - November 2022 - KVET CS successfully purchased a quantity of fentanyl from HENDERSON.

11. All four controlled buys were arranged by contacting HENDERSON via telephone, at phone number 650-602-1304. I have learned through freecarrierlookup.com that this phone number is on the Verizon network. Both **Subject Device**s were on the Verizon network at the time of seizure.

12. On November 10, 2022, KVET investigators executed a State of Michigan search warrant at HENDERSON's residence on Florence Street, in Kalamazoo, MI. The warrant/entry was executed by the Kalamazoo Metro SWAT Team (KM-SWAT). KM-SWAT located HENDERSON in the living room of the house. HENDERSON was the only person present.

13. On two bar stools in the kitchen dining area, investigators located **Subject Device 1** and **Subject Device 2**. **Subject Device 1** was charging and on an active/open call for the past 4 hours and 8 minutes. HENDERSON was within 10 feet of the **Subject Devices** when law enforcement found them and was the only individual inside the residence at the time of the search.

14. In the upstairs bedroom, investigators located:

    a. A shoulder-sling style backpack. Inside was a stolen Glock 22, Gen4, .40cal handgun, Serial # VVP650. The firearm was loaded with one cartridge in the chamber, had a loaded magazine, and two spare magazines in the backpack. Additionally, the backpack contained

HENDERSON's Michigan enhanced driver's license, Costco card, MI medical marijuana card, and two bank cards with HENDERSON's name.

b. Tactical Mirror containing an Anderson Manufacturing AM-15 multi-cal rifle, Serial #21173053. The rifle was loaded with one cartridge in the chamber and a loaded drum-magazine.  Below are photographs of the Glock found in the backpack and the AM-15 multi-cal rifle.



15.   In the kitchen, investigators located several items of evidence, including:

a. Operational digital scale with suspected fentanyl residue next to kitchen sink.

b. Operational digital scale in kitchen cabinet and digital scale in the island table drawer.

c.  Nitrile gloves and sandwich bags in the kitchen pantry.

d.  Backpack with 2 baggies containing 164.16 grams of a heroin and fentanyl mixture in the kitchen pantry.

e.  Bag containing 55.05 grams of methamphetamine in kitchen pantry near a large bowl and spoon with methamphetamine residue.

f.  Camouflage duffle bag in kitchen containing:

   i.  Bag containing 405.66 grams of heroin.

   ii.   hand metal press, larger hydraulic press, 2 blenders, sifter, lactose powder, which can be used as a cutting agent, scissors, vinyl gloves, acetone spray.

g.  Black laptop carrying case containing:

   i.  368.96 grams of fentanyl.

   ii.  1,977.58 grams of fentanyl in the form of two compressed "bricks."

   iii.  111.14 grams of heroin.

   iv.  299.25 grams of a heroin and fentanyl mixture.

   v.  908.59 grams of a heroin and fentanyl mixture.

   vi.  5.80 grams of cocaine HCL.

h.  Red backpack containing glass bottle/jar with suspected ecstasy pills. (These pills lab tested as 434.50 grams of a mixture containing methamphetamine).

i.  Grey adidas duffle bag containing 10 firearm magazines, 9 of which were loaded with ammunition.

j.  Black duffle bag containing:

    i.  **Stolen** Springfield Armory "Saint", multi-cal AR-15, Serial# ST 248819.

    ii.  **American** Tactical, GSG-522, .22LR cal, Serial # "A571690"

    iii.  **Anderson** Manufacturing, AM-15, multi-cal rifle, Serial # "17028157."

16.    The photograph below shows a few of the items seized from the duffle bag mentioned above.



17.    I believe HENDERSON is the only resident of 524 Florence Street because the residence has just one bedroom and bathroom.  Furthermore, when law enforcement searched the residence, they found no indication that other individuals were living there.  Law enforcement noted that all of the clothing inside the residence was male clothing of HENDERSON's size.  Law enforcement also noted that there was just just one toothbrush in the bathroom.

18.    I know from my training and experience that drug traffickers will frequently keep firearms in their homes to protect themselves, their controlled substances, and/or drug proceeds.

19.    I consulted with Special Agent Ted Westra, an Interstate Nexus Expert from the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF); he confirmed that all five firearms seized from 524 Florence St were not manufactured in the State of Michigan. A further examination of the firearms will occur to determine the firearm's exact state/country of manufacture.

20.    The identity of the controlled substances noted above have been confirmed through laboratory testing.

21.    Based on my training and experience, I know that drug traffickers frequently use cell phones to conduct their drug trafficking business. For example, I have encountered drug dealers who use one cell phone/phone number to communicate with their suppliers and a separate cell phone/phone number to communicate with their customers. I have also encountered drug dealers who use one cell phone/phone number for certain customers and co-conspirators with whom they have long-standing relationships that the drug dealers therefore believe are more trustworthy and a separate cell phone/phone number to communicate with lesser known and lesser trusted customers.

21.    Further, based upon my training, experience, and participation in drug investigations and financial investigations relating to drug investigations, I am aware of the following:

a.     Drug traffickers often keep names, aliases, and/or contact information of suppliers, purchasers, and others involved in drug trafficking in their devices.

b.     Drug traffickers sometimes use electronic messaging or messaging apps, in addition to MMS, SMS text messages, and voice call, to communicate with suppliers, purchasers, and others involved in drug trafficking on their devices.

c.     Drug traffickers often take pictures or videos of their drug trafficking associates, drugs, money and/or firearms, which they store on their devices.

d.     Global Position System (GPS) data on phones may show the location of a drug trafficker at a given time, which may provide corroborating evidence of a drug delivery or other instance of drug trafficking.

e.     It is common for persons involved in drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of drug proceeds.  This evidence includes currency, financial instruments, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, and records concerning storage lockers.  These and other items are maintained by the drug traffickers within their residences or other locations over which they maintain dominion and control.

f.     That when drug traffickers amass large proceeds from the sale of controlled substances that the drug traffickers attempt to legitimize these profits through money laundering activities.  To accomplish these goals, drug traffickers utilize but are not limited to, domestic and international banks and their attendant services, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts, storage lockers, safe deposit boxes and otherwise legitimate businesses that generate large quantities of currency. In my training and experience, drug traffickers often maintain records related to their money laundering activities on their devices.

g.     Drug traffickers commonly have in their possession, either on their person or at their residence, firearms. These firearms are used to protect and secure the proceeds and products of drug

trafficking and the drug trafficker himself.

h.      User attribution data and usernames, passwords, documents, and browsing history can provide evidence that the device is being used by a drug trafficker and can provide other useful evidence to the drug investigation; and

i.      Drug traffickers often use the internet to look up various information to support their drug trafficking activities.

## Technical Terms

22.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.      Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.      Digital camera:   A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can

contain any digital data, including data unrelated to photographs or videos.

c.     Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.     GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.     PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-

processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.   IP Address: An internet protocol address (or simply "IP address") is a unique numeric address used by computers on the internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the internet must be assigned an IP address so that internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g.   Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

23.    Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online, I know that the **Subject Devices** have capabilities that allows it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and/or PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

**Electronic Storage and Forensic Analysis**

24.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have

13

been viewed via the internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

25.   *Forensic evidence.*   As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **Subject Devices** were used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the **Subject Devices** because:

   a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b.   Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c.   A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   d.   The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e.      Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

26.     *Nature of examination.*   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **Subject Devices** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

27.     *Manner of execution.*   Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

28.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the **Subject Devices** described in Attachment A to seek the items described in Attachment B.